UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

TOMMY S. DEMIERRE,                    )
                                      )
                    Plaintiff,        )
                                      )
        v.                            )    No.  4:06CV1099 FRB
                                      )
MICHAEL J. ASTRUE,[1] Commissioner    )
of Social Security,                   )
                                      )
                    Defendant.        )


## MEMORANDUM AND ORDER

        This cause is on appeal for review of an adverse ruling
by the Social Security Administration.   All matters are pending
before the undersigned United States Magistrate Judge, with consent
of the parties, pursuant to 28 U.S.C. § 636(c).

### I. Procedural History

        On September 23, 2004, plaintiff Tommy S. DeMierre filed
an application for Supplemental Security Income (SSI) pursuant to
Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et seq.,
in which he claimed that he became disabled on July 1, 1995.  (Tr.
151-57.)[2]   On  initial  consideration,  the  Social  Security

_____

        [1]Michael J. Astrue became Commissioner of Social Security on
February 12, 2007.  Pursuant to Rule 25(d)(1) of the Federal Rules
of Civil Procedure, Michael J. Astrue is substituted for Former
Commissioner Jo Anne B. Barnhart as defendant in this cause.

        [2]Plaintiff had previously been awarded a closed period of
disability from December 1, 1993, through March 31, 1995.  Benefits
continued, however, through August 2001.  (Tr. 64-66.)  Plaintiff
filed another application for benefits on September 8, 2001, which
was denied initially on January 3, 2002.  On plaintiff's motion,
plaintiff's request for hearing on the September 2001 application
was dismissed.  (Tr. 47, 48.)  In the instant cause, the ALJ found

- 1 -

Administration denied plaintiff's application for benefits. (Tr. 124, 141-45.) On November 2, 2005, a hearing was held before an Administrative Law Judge (ALJ). (Tr. 20-44.) Plaintiff testified and was represented by counsel. On January 21, 2006, the ALJ issued a decision denying plaintiff's claim for benefits. (Tr. 10-19.) On June 23, 2006, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. 5-8.) The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

At the hearing on November 2, 2005, plaintiff testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, plaintiff was forty-three years of age. Plaintiff is divorced, has no children and lives alone on the first floor of a two-story rental house owned by his parents. (Tr. 23, 40.) Plaintiff stands five-feet, six inches tall and weighs approximately 175 pounds. Plaintiff is right-handed. Plaintiff is a high school graduate. (Tr. 24.) Plaintiff attended Vocational Rehabilitation in 2002. (Tr. 41.)

Plaintiff testified that he last worked in 2003 for a three- or four-week period performing computer scanning. Plaintiff testified that he had to stop such work because of pain in his back, neck, arm, and leg. (Tr. 25.) Plaintiff testified that prior to his work as a scanner, he worked at "Potter" performing

---

the January 2002 determination to be administratively final and to have res judicata effect. (Tr. 13.) Plaintiff does not challenge this finding.

assembly work for one week but had to leave that employment due to pain. (Tr. 25-26.) Plaintiff testified that he had previously worked at Lawson Screen Product for approximately ten years performing machine assembly. (Tr. 26, 106, 107.) Plaintiff testified that he stopped working at Lawson in 1993 because of a back injury he sustained at work. (Tr. 26.) Plaintiff testified that a worker's compensation claim was settled in 1998 and that he received $80,000.00. (Tr. 27.)

Plaintiff testified that pain prevents him from working. Plaintiff testified that his leg gives way and that he has difficulty concentrating due to pain. (Tr. 27-28.) Plaintiff testified that he experiences pain in his lower back, upper back, shoulder blades, and in his neck. Plaintiff testified that he experiences a constant, throbbing pain but that he sometimes experiences a shooting, stabbing pain which causes him to stop what he is doing and either lie down or walk around. Plaintiff testified that he experiences this shooting pain three or four times each day. Plaintiff testified that he must prop himself up with his hand when he sits to alleviate some of his back pain. (Tr. 28.)

Plaintiff testified that he also experiences pain in his right hand and that his doctor has advised him that the condition may be a nerve problem. (Tr. 28-29.)

Plaintiff testified that he also experiences occasional pain in one of his eyes due to a fractured cheek bone and eye socket he experienced as a result of being mugged in 2000. (Tr.

29.)

Plaintiff testified that he visits his doctors every three to six months and takes pain medication every day as prescribed. (Tr. 29-30.) Plaintiff testified that the beneficial effects of his medication last for only minutes but that he experiences side effects from his medication, such as dizziness and a dry mouth. (Tr. 30.) Plaintiff testified that he last participated in physical therapy approximately one year prior. (Tr. 41.)

Plaintiff testified that he tries to take his mind off of the pain by walking around or watching television. (Tr. 37.) Plaintiff testified that the intensity of the pain increases throughout the day and reaches a level eight on a scale of one to ten. (Tr. 37-38.) Plaintiff testified that he experiences level five pain nearly every day, and that the pain increases to a level eight for an hour or two each day. (Tr. 38.)

Plaintiff testified that he has difficulty sleeping because pain awakens him nearly every hour and because his body jerks throughout the night. (Tr. 30-31.) Plaintiff testified that his arm and leg also become numb during the night and that he gets up and walks around to regain sensation. Plaintiff testified that he gets approximately four or five hours of sleep each night. Plaintiff testified that his doctor has prescribed a sleeping pill for him but that his pharmacy will not fill the prescription because "it's against the regulation[.]" Plaintiff testified that he lies down two or three times a day, for up to an hour each time.

(Tr. 31.)

As to his daily activities, plaintiff testified that he walks to his mother's house, which is about one block from his home. Plaintiff testified that he visits with his mother and helps her with cooking. (Tr. 33, 41.) Plaintiff testified that he also eats there inasmuch as he does not have much to eat at his home. Plaintiff testified that his brother brings him home later in the day because he is unable to walk back home on account of too much pain caused by activity at his mother's house. (Tr. 33.) Plaintiff testified that he does his laundry at his home once every week or every other week and engages in other housework, depending upon how his back feels. (Tr. 34, 42.) Plaintiff testified that he sometimes mows his lawn and, depending upon his level of back pain, may mow in increments rather than the entire lawn. (Tr. 42.) Plaintiff testified that he walks three to four blocks to the grocery store and carries home his groceries, which weigh no more than ten pounds. (Tr. 34-35.) Plaintiff testified that he watches television and listens to the radio during the day and sometimes reads. (Tr. 35.) Plaintiff testified that he also works and reads on his computer, and that he can sit at the computer for a maximum period of one hour before he must get up and move around or lie down. (Tr. 36.) Plaintiff testified that he has no friends and that he does not go out because he has difficulty getting around and getting in and out of cars. (Tr. 37.) Plaintiff testified that he has a driver's license but does not drive because of back and neck pain, and because his leg falls asleep when he drives.

(Tr. 24.)

Plaintiff testified that he can sit for up to an hour if he sits still or props himself with his hand, but that twisting or reaching causes pain which limits his ability to sit. (Tr. 37-38.) Plaintiff testified that he is unable to stand still and must keep moving to maintain sensation in his leg. Plaintiff testified that he can walk from one-half block up to six blocks, depending upon the level of pain in his back. (Tr. 39.) Plaintiff testified that he cannot bend over and must kneel to pick things up from the ground. (Tr. 39-40.) Plaintiff testified that he can shower and dress himself but that it takes him longer than normal to perform such activities. Plaintiff testified that he has difficulty putting on shoes, especially those with laces, because of his difficulty in bending. (Tr. 31-32.)

### III.  Medical Records

On October 12, 1993, plaintiff visited Dr. Richard H. Ashby and reported that he injured his back in June 1993 and has experienced increasing pain in his back and right leg since that time. (Tr. 376-77.) Plaintiff reported that the pain had become more severe during the previous week. Physical examination showed normal curve of the cervical spine with no spasm and with full range of motion. (Tr. 376.) Examination of the lumbar spine showed minimal tenderness over the right sciatic nerve. Forward bending was limited to seventy degrees with some pain in the back. Straight leg raising was limited to eighty degrees on the left with back pain, and sixty degrees on the right with pain in the right

leg. Dr. Ashby opined that plaintiff appeared to have evidence of S1 radiculopathy on the right with possible disc rupture. Diagnostic examinations were ordered. (Tr. 377.) Plaintiff was instructed to remain off of work. (Tr. 376.)

An MRI taken of plaintiff's lumbar spine on October 13, 1993, showed congenital spinal stenosis; disc herniation of the L5-S1, lateralizing within the canal to the right side; and central disc herniation at L4-5. (Tr. 414.)

On October 18, 1993, plaintiff returned to Dr. Ashby who informed him of the MRI results and advised that surgery was required. Dr. Ashby suggested for plaintiff to obtain a second opinion from another spine surgeon and referred plaintiff to Dr. Wayne. In the meanwhile, Dr. Ashby instructed plaintiff not to work and to participate in physical therapy. Darvocet[3] and Robaxin[4] were prescribed. (Tr. 375.)

On December 15, 1993, plaintiff underwent bilateral decompression laminectomy at L4-L5 and S1, and discectomy of L4-5 and L5-S1. (Tr. 373-74.)

Plaintiff followed up with Dr. Ashby on January 24, 1994, and reported very little pain. Plaintiff had good range of motion and straight leg raising was normal. Dr. Ashby determined to continue plaintiff on physical therapy and to start plaintiff on a

_____

[3]Darvocet is indicated for the relief of mild to moderate pain. Physicians' Desk Reference 1708-09 (55th ed. 2001).

[4]Robaxin is indicated as an adjunct to rest, physical therapy and other measures for the relief of discomfort associated with acute, painful musculoskeletal conditions. Physicians' Desk Reference 2716 (55th ed. 2001).

- 7 -

work hardening program in one month.  Dr. Ashby observed plaintiff
to be recovering normally and opined that he would be able to
return to work in about three months.  (Tr. 372.)

Plaintiff returned to Dr. Ashby on February 22, 1994, and
reported having a little occasional back pain.  Physical and
neurological examinations were normal.  Dr. Ashby noted plaintiff
to be making a very good recovery and determined for plaintiff to
continue in a reconditioning program for another two to three
weeks.  Dr. Ashby opined that at that time, plaintiff should be
able to return to work without restrictions.  (Tr. 371.)

Plaintiff returned to Dr. Ashby on March 15, 1994, who
noted plaintiff to exhibit no symptoms.  Dr. Ashby determined for
plaintiff to participate in a work hardening program and then be
released to work.  It was suggested that plaintiff start with
lighter work upon his return.  (Tr. 370.)

Plaintiff returned to Dr. Ashby on April 19, 1994, and
complained of experiencing some back pain with a lot of bending and
lifting.  Plaintiff also complained of experiencing occasional leg
pain.  It was noted that plaintiff exhibited no symptoms with
normal activity.  Physical examination was normal.  Neurological
examination showed decreased right ankle jerk.  Dr. Ashby
determined to continue plaintiff with the work hardening program
for an additional two or three weeks.  Dr. Ashby opined that
plaintiff should be able to return to work at that time with a
restriction to lifting no more than fifty pounds.  (Tr. 369.)

On June 9, 1994, plaintiff returned to Dr. Ashby and

reported that he had been back to work and was performing only light work. Plaintiff complained that he began experiencing some back pain during the previous two days and that he has had occasional pain into his right leg traveling down to the lower leg. Physical examination showed plaintiff to have eighty degrees flexion and twenty degrees extension of the lumbar spine. Straight leg raising was noted to be painful at eighty degrees. Dr. Ashby ordered additional diagnostic studies and prescribed Toradol[5] and Flexeril.[6] (Tr. 368.)

X-rays taken of plaintiff's lumbar spine on June 9, 1994, showed plaintiff to be status-post laminectomy of the lowest bearing segment with an interior partial laminectomy of the next lowest segment. Congenital spinal stenosis was also noted. No abnormal motion with flexion or extension was observed. (Tr. 413.) Upon review of plaintiff's x-rays, Dr. Ashby determined that plaintiff could continue to work and would be treated symptomatically as needed. (Tr. 367.)

Plaintiff returned to Dr. Ashby on July 12, 1994, and complained of increasing back pain with pain into his right leg. Plaintiff reported the pain not to be severe, but that it was constant, worsened with activity, and was becoming a significant

---

[5]Toradol is indicated for the short-term management of moderately severe acute pain that requires analgesia at the opioid level. Physicians' Desk Reference 2789-91 (55th ed. 2001).

[6]Flexeril is indicated as an adjunct to rest and physical therapy for relief of muscle spasm associated with acute, painful musculoskeletal conditions. Physicians' Desk Reference 1929 (55th ed. 2001).

factor.  Physical and neurological examinations were normal. Noting plaintiff to be working and well motivated, Dr. Ashby determined to order further diagnostic studies.  (Tr. 366.)

An MRI taken of plaintiff's lumbar spine on July 15, 1994, showed post-operative changes at L4-5 and at L5-S1.  A significant compound of non-enhancing material present at L4-5, lateralizing to the right, was noted to be consistent with recurrent disc herniation.  A congenitally small canal was also noted.  (Tr. 411-12.)  Upon review of the MRI results, Dr. Ashby determined for plaintiff to undergo a series of epidural steroid injections for relief of leg pain and numbness.  Dr. Ashby instructed that plaintiff could continue with his present job with restrictions.  Plaintiff was to return in one month.  (Tr. 365.)

On August 25, 1994, plaintiff complained to Dr. Ashby of gradual worsening of back pain radiating down to the right foot. It was noted that two epidural steroid injections provided no relief.  Physical examination was essentially normal with pain elicited upon straight leg raising on the right.  Neurological examination showed the right ankle reflex to be absent and there was some decreased sensation in S/1 distribution bilaterally.  Dr. Ashby noted plaintiff not to have responded to conservative therapy and opined that further surgery may be needed.  (Tr. 364.)

Plaintiff was examined by Dr. David B. Robson on September 22, 1994.  Physical examination showed positive straight leg raising at eighty degrees and absent ankle reflex on the right. (Tr. 362.)  Dr. Robson noted an MRI to show a large recurrent disc

- 10 -

herniation at L5-S1 on the right and degenerative disc disease at L3-4 and L4-S1. (Tr. 362.) Dr. Robson recommended further surgery and ordered additional diagnostic testing. (Tr. 363.)

Plaintiff was admitted to Missouri Baptist Medical Center on September 27, 1994, to undergo testing in relation to his complaints of increasing lumbar pain and radicular pain in the right leg. It was noted that plaintiff underwent lumbar surgery in December 1993 and had returned to work in June or July 1994. A CT scan showed post-operative changes at the lowest two lumbar levels, as well as evidence of recurrent disc herniation at the L4-L5 level, lateralizing to the right within the canal, producing marked mass effect upon the right L5 nerve root and significant canal stenosis. More subtle disc abnormality was noted at the L5-S1 level, again with lateralization to the right within the canal. A myelogram of the lumbar spine taken that same date showed evidence of large disc herniation at L4-L5, producing significant canal stenosis. No instability with flexion or extension was noted. Plaintiff was diagnosed with recurrent herniated nucleus pulposus with lower extremity radicular pain. (Tr. 403-10.)

On October 6, 1994, plaintiff returned to Dr. Robson who recommended further surgery. Dr. Robson advised plaintiff that such surgery would be followed by brace treatment and a six- to eight-month recovery period before maximum medical improvement would be obtained. (Tr. 361.)

Plaintiff underwent surgery at Missouri Baptist on November 16, 1994, during which a decompressive laminectomy of the

L4-5 was performed, as well as discectomy of the L4-5 and lumbar interbody fusion of the L4-5. (Tr. 390, 394-97.) Upon discharge on November 21, 1994, plaintiff was instructed to engage in no strenuous activities, including no lifting and no bending. (Tr. 392.)

Plaintiff followed up with Dr. Robson on December 20, 1994, who noted plaintiff to be doing relatively well. Plaintiff continued to complain of some mild leg pain which Dr. Robson noted to be similar to the pain plaintiff experienced pre-operatively. Dr. Robson instructed plaintiff to increase his activity, to take Vicodin[7] for pain and to eventually wean himself off of Vicodin to Tylenol or Advil. Dr. Robson instructed plaintiff to return in six weeks at which time plaintiff would be weaned from his brace. (Tr. 360.)

On January 31, 1995, plaintiff reported to Dr. Robson that he had some mild irritation in his legs which Dr. Robson noted to be unlike the pain plaintiff experienced pre-operatively. Plaintiff was instructed to start weaning himself from his brace and to return for follow up in five weeks at which time physical therapy would be started. (Tr. 359.)

Plaintiff returned to Dr. Robson on March 7, 1995, and complained of low back pain and intermittent leg pain. Dr. Robson noted plaintiff's x-ray to look "acceptable" and plaintiff was referred for physical therapy. (Tr. 358.)

_____

[7]Vicodin is indicated for the relief of moderate to moderately severe pain. <u>Physicians' Desk Reference</u> 1629-30 (55th ed. 2001).

On May 2, 1995, Dr. Robson noted plaintiff to be doing relatively well and that plaintiff's leg pain seemed to be improving slightly. Dr. Robson instructed plaintiff to slowly increase his weights at physical therapy, not to exceed fifty pounds. Plaintiff was instructed to return for follow up in six weeks. (Tr. 356.)

Plaintiff returned to Dr. Robson on June 13, 1995, and reported his same complaints of low back pain and intermittent leg pain. Dr. Robson noted plaintiff's x-ray to look excellent, and that plaintiff's work hardening report showed plaintiff able to occasionally lift forty to forty-five pounds. Dr. Robson opined that plaintiff had reached maximum medical improvement. Dr. Robson offered additional diagnostic testing regarding plaintiff's complaints of continued pain. (Tr. 355.)

Plaintiff was admitted to Missouri Baptist on June 28, 1995, to undergo diagnostic tests of his lumbar spine in response to his complaints of worsening pain. Dr. Robson noted plaintiff to have done well for one month subsequent to back surgery in 1995 but that the pain significantly worsened upon starting physical therapy. Dr. Robson noted plaintiff to have bilateral leg pain radiating into the left leg, and that plaintiff also experienced bilateral leg numbness. An x-ray taken of plaintiff's lumbar spine showed narrowing of the intervertebral disc space at L4-L5 and L5-S1, which suggested degeneration of the disc spaces. (Tr. 389.) A CT scan showed suggestion of degenerative disc disease at both L4-L5 and L5-S1. No definite evidence of disc herniation or

protrusion was noted, nor was there any definite evidence of neural impingement. (Tr. 387.) A myelogram performed that same date showed consistent results. (Tr. 385-86.) Plaintiff was diagnosed with chronic lumbosacral pain. (Tr. 384.)

Plaintiff returned to Dr. Robson on July 22, 1995, who noted recent tests to show no evidence of herniated disc or spinal stenosis, but that a slightly narrow spinal canal existed on a congenital basis. Dr. Robson noted that films showed stability on flexion and extension and no significant nerve root impingement. Plaintiff continued to complain of right leg pain as well as decreased range of motion of the lumbar spine. Dr. Robson recommended no further surgical treatment and opined that plaintiff had reached maximum medical improvement. Dr. Robson restricted plaintiff to lifting no more than forty-five pounds, with repetitive lifting of thirty pounds. Additional restrictions of no excessive bending, twisting or stooping were imposed, as well as the requirement that plaintiff needs to change positions. (Tr. 352.)

On November 14, 2001, plaintiff underwent an orthopedic evaluation for disability determinations. (Tr. 345-50.) Plaintiff complained to Dr. Jack C. Tippett of low back pain, pain and numbness in the right lower extremity, and neck pain. Dr. Tippett noted plaintiff's medical history. Plaintiff reported that he has had no evaluation of or treatment for his back since he was released from care subsequent to his second back surgery. Plaintiff reported that he has developed pain and stiffness in his

neck, stiffness in his arms and that occasionally his arms go to sleep. Plaintiff reported that his neck and arm conditions began after his second operation, but that he did not receive treatment inasmuch as it was thought that such conditions were not related to the reason for his hospitalization. Plaintiff reported that he discontinued driving because he was unable to control the accelerator on one occasion on account of numbness in his right foot. (Tr. 345.) Physical examination showed plaintiff to have limited range of motion of the cervical and lumbar spine. (Tr. 346, 350.) Straight leg raising was positive on the right at thirty degrees. (Tr. 350.) Plaintiff experienced mild decrease in range of motion about the right hip. (Tr. 346, 350.) Otherwise, examination of the lower extremities was normal. Tenderness was noted about the lumbar region. Neurological examination showed no definite ankle reflex on the right, with mild hypesthesia over the lateral aspect of the right foot. Plaintiff could stand briefly on his toes and heels. Plaintiff could assume a squatting position with difficulty and required assistance to resume a standing position. Plaintiff was observed to be able to dress and undress himself and to get on and off the examining table without assistance. Examination of the upper extremities was normal. (Tr. 346.) Dr. Trippett opined that plaintiff had chronic low back syndrome with history of discectomy followed by lumbar spinal fusion; right lumbar radiculopathy; and chronic neck strain. (Tr. 346-47.) X-rays taken of plaintiff's lumbar spine that same date showed lumbosacral spine fusion, L4 through S1, with pedicle screw

fixation; and narrowing of the L4-5 and L5-S1 disc spaces. (Tr. 348.)

On November 30, 2002, plaintiff underwent Vocational Assessment at MERS/Goodwill. (Tr. 240-45.) Achievement tests showed plaintiff to perform at the fourth grade level in Language and at the eighth grade level in Math. The Wonderlic Personnel Test showed plaintiff to be able to operate simple process equipment. (Tr. 243.) Aptitude testing showed plaintiff to score in the low average range in learning ability; in the below average range in verbal aptitude and numerical aptitude; and in the average range for spatial aptitude, form perception, clerical perception, motor coordination, finger dexterity, and manual dexterity. (Tr. 244-45.) In work sample testing, plaintiff did not meet standards in independent problem solving. Plaintiff did meet standards in multi-level sorting. (Tr. 245.) Plaintiff was observed to be a slow but steady worker, to interact in a pleasant manner, and to follow instructions well. (Tr. 242.) Plaintiff received a rating of "excellent" after he participated in a one-week evaluation at Potter Electric performing benchwork. Potter offered employment to plaintiff, but plaintiff declined because the bus ride was too difficult for him. (Tr. 241.)

Plaintiff visited St. Louis ConnectCare on April 24, 2003, and complained of back pain and pain in the left arm. (Tr. 342.) Plaintiff also complained of pain in his right leg and that the leg goes to sleep all of the time. Plaintiff reported that taking Tylenol and Motrin did not help the pain. It was noted that

plaintiff used to work and relied on Vocational Rehabilitation through MERS/Goodwill. (Tr. 339.) Physical examination showed mild tenderness to palpation of the lumbar spine. Sensation to light touch was noted to be decreased in the right lower extremity. (Tr. 342.) X-rays taken of the lumbosacral spine showed status-post internal fixation at the L4, L5 and S1. X-rays of the cervical spine were normal. (Tr. 341.) Plaintiff was diagnosed with chronic back pain and was prescribed Elavil[8] to be taken at night. (Tr. 342.)

Plaintiff was employed at "Goodwill Contracts" from February 24, 2003, through May 10, 2003. MERS/Goodwill reported that plaintiff lost his job on May 10 because of his medical problems, and Goodwill determined to terminate plaintiff's case effective July 21, 2003. (Tr. 239.)

Plaintiff returned to St. Louis ConnectCare on May 18, 2003, and reported that his pain had mildly improved with Naproxen.[9] Plaintiff reported the Elavil not to be working. Mild tenderness to palpation was noted over the lumbar spine. Plaintiff was diagnosed with chronic back pain and status-post laminectomy

---

[8]Elavil (Amitriptyline) is used for the relief of symptoms of depression, Physicians' Desk Reference 626 (55th ed. 2001), but is also sometimes used to treat chronic pain, Medline Plus (last revised Apr. 1, 2005)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682388.html>.

[9]Naproxen (Naprosyn) is a non-steroidal anti-inflammatory agent indicated for the treatment of rheumatoid arthritis, osteoarthritis, ankylosing spondylitis, and for the management of pain. Physicians' Desk Reference 2744-45 (55th ed. 2001).

L4-L5. Plaintiff was prescribed Ultracet[10] and was instructed to increase his Elavil. Plaintiff was instructed to return in six weeks. (Tr. 338.)

On June 27, 2003, plaintiff complained to St. Louis ConnectCare of continued low back pain radiating to the right lower extremity with parasthesias on the right medial aspect of the foot. With activity, plaintiff reported his pain to be at a level seven or eight on a scale of one to ten, but reported that his pain decreases with medication to a level five for a couple of hours. Plaintiff's medications were noted to be Elavil, Naproxen and Ultracet. (Tr. 337.) Upon physical examination, plaintiff was diagnosed with chronic back pain and was referred for pain management. Plaintiff was instructed to continue with Naproxen and to increase his dosages of Ultracet and Elavil. (Tr. 336.)

Plaintiff returned to St. Louis ConnectCare on October 3, 2003, for follow up. (Tr. 334-35.) Plaintiff's medications were noted to be Amitriptyline,[11] Naproxen and Ultracet. Plaintiff's diagnoses of chronic back pain, status-post laminectomy, fusion, and decompressive laminectomy were noted. Plaintiff complained of having neck pain for many years with the pain radiating to both hands. Plaintiff complained of intermittent weakness with his right grip. Plaintiff continued to complain of low back pain

---

[10]Ultracet is an opiate agonist used to relieve moderate to moderately severe pain. It is used only by people "who are expected to need medication to relieve pain around-the-clock for a long time." Medline Plus (last revised July 1, 2007)<http: //www.nlm.nih.gov/medlineplus/druginfo/medmaster/a695011.html>.

[11]See supra n.8.

radiating to both legs. (Tr. 334.) Physical examination was unremarkable. Plaintiff was diagnosed with low back pain with lumbar radiculopathy, and neuralgia with probable cervical radiculopathy. A CT scan was ordered of the lumbosacral and cervical spine. Plaintiff was referred to Neurology. Plaintiff was instructed to continue with Ultracet and Naproxen and was further instructed to increase his dosage of Amitriptyline. Plaintiff was instructed to follow up with a pain clinic if it was covered by voucher. (Tr. 335.)

A CT scan of the cervical spine and x-rays of the lumbar and cervical spine taken October 27, 2003, were unremarkable. (Tr. 331-33.)

Plaintiff visited the Neurology Clinic at St. Louis ConnectCare on November 17, 2003. Plaintiff's chronic low back pain was noted as well as plaintiff's complaints of neck pain radiating to both arms. Plaintiff reported that he experienced some numbness in his fingers and that he has difficulty opening and closing his hand and with dressing and undressing. Sensation was noted to be decreased on the dorsum of the right foot and of the fifth digit of his right hand. Upon conclusion of the examination, plaintiff was diagnosed with chronic low back/neck pain. Plaintiff was instructed to increase his dosage of Elavil and was instructed to return in six months. (Tr. 265.)

Plaintiff returned to St. Louis ConnectCare on February 4, 2004, and continued to complain of low back pain radiating to the legs, and pain in his arms, wrists and neck. Plaintiff also

reported that he experiences intermittent dizziness. (Tr. 326.) It was opined that such dizziness was caused by Amitriptyline. Physical examination was unremarkable. Plaintiff was diagnosed with low back pain, neck pain and hypercalcemia. Plaintiff was instructed to continue with his medications and was referred to a pain service clinic. (Tr. 327.)

Plaintiff returned to the Neurology Clinic at St. Louis ConnectCare on May 17, 2004, and complained of continued neck pain radiating down the right arm, and low back pain radiating down the right leg. Plaintiff reported that stress and exercise aggravate the pain and that lying in a prone position relieves the pain. Plaintiff also reported that his left leg occasionally gives out. (Tr. 262.) Plaintiff requested no change in his current treatment regimen, and plaintiff was instructed to return in six months. (Tr. 263.)

On May 18, 2004, plaintiff returned to St. Louis ConnectCare and complained of back and neck pain, and pain in his right leg and arm. Plaintiff also complained of his right arm and leg falling asleep. Physical examination showed pain over the lumbar spine. Plaintiff was diagnosed with back pain and radicular pain in the arms. It was noted that plaintiff had an appointment scheduled with a pain clinic. A follow up referral to Neurology was arranged. (Tr. 325.)

Plaintiff visited the Pain Management Clinic at Barnes Jewish Hospital on July 7, 2004, for initial evaluation. (Tr. 297-307.) Plaintiff complained of low back pain which radiates to his

legs and reported the average level of pain to be six on a scale of one to ten, with such pain ranging between level two and level eight. Plaintiff reported the pain to be sharp and aching with associated tingling and numbness radiating to his legs. (Tr. 297, 298.) Plaintiff reported that his right leg has given out and that he does not drive because his leg goes to sleep and he cannot control his leg with prolonged sitting. (Tr. 303.) Plaintiff reported that he is unable to work because of pain and that he cannot initiate or maintain sleep because of pain. (Tr. 298.) Plaintiff reported that weather, cold, walking, sitting, stress, exercise, and all activities aggravate the pain; and that bathing, showering and rest help decrease the pain. (Tr. 297, 298.) Plaintiff reported that his parents help him, but that he is able to cook, clean, bathe, and shop himself. (Tr. 297.) Dr. Myint Maw noted plaintiff's medications to be Naproxen, Ultracet and Amitriptyline as prescribed by Dr. Nayak at St. Louis ConnectCare. Physical examination showed plaintiff to walk with a slightly antalgic gait favoring his right foot. Plaintiff was able to walk on his heels and toes without assistance. Movement of the spine was normal in all directions. Some focal tenderness was noted on deep palpation of the lumbar spine. Motor and sensory examinations were normal. Straight leg raising was negative. (Tr. 298.) Plaintiff was diagnosed with post lumbar laminectomy syndrome and right sciatica. Plaintiff was instructed to participate in physical therapy and to continue with pain medications as prescribed by Dr. Nayak. Diagnostic testing was ordered and

plaintiff was instructed to return in one month.  (Tr. 299.)

An x-ray of plaintiff's lumbar spine taken July 7, 2004, showed posterior lumbar fusion with solid fusion, and sacroiliac joint sclerosis.  (Tr. 306.)

Plaintiff returned to the Pain Clinic on August 16, 2004, and reported no change in his pain pattern or in the intensity of the pain.    Plaintiff reported that he can sleep well with medication.    Dr. Maw observed plaintiff to be a bit drowsy. Plaintiff reported that he had not yet attended physical therapy. Physical examination showed no change from plaintiff's last visit. (Tr. 292.)  Plaintiff was diagnosed with chronic low back pain with right sciatica, and post laminectomy syndrome with neuropathic pain.  Plaintiff was instructed to participate in physical therapy and a referral was given.  Plaintiff was prescribed Neurontin[12] and was instructed to continue with his other medications as prescribed by Dr. Nayak.  (Tr. 292-93.) Plaintiff was instructed to return to the Pain Clinic in four weeks.  (Tr. 293.)

On August 17, 2004, plaintiff complained to St. Louis ConnectCare of back and neck pain and also reported that his right leg becomes weak and numb.  Plaintiff's past surgical procedures were noted as well as his current medication regimen.  Plaintiff reported that, overall, his symptoms had not improved but that they had not worsened.    Plaintiff was diagnosed with post lumbar

---

[12]Neurontin is an anticonvulsant used to relieve the pain of post-herpetic neuralgia, i.e., pain after "shingles," by changing the way the body senses pain.  Medline Plus (last revised July 1, 2006)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a6940 07.html>.

laminectomy syndrome and right sciatica.  Plaintiff was instructed to continue with the Pain Clinic.  It was noted that plaintiff was prescribed Neurontin.  Plaintiff was instructed to also continue with his other medications of Naproxen, Ultracet and Amitriptyline. (Tr. 323.)

Plaintiff appeared at St. Louis University Hospital Rehabilitation Center on September 9, 2004, for physical therapy. (Tr. 233-37.)  Plaintiff's relevant medical history was noted. Plaintiff reported his symptoms to increase with trunk twisting, sitting longer than one hour, or standing longer than one hour. Plaintiff reported his symptoms to decrease with walking or lying down on either side.  In his posture, plaintiff was noted to have decreased lumbar lordosis. (Tr. 233.) Palpation showed tenderness along the L4 vertebrae.  Plaintiff showed decreased strength and limited mobility with rotation.  (Tr. 233-34.)

Plaintiff returned to the Pain Clinic on September 21, 2004, and reported that he did not notice any pain relief with Neurontin.  Plaintiff reported his pain to currently be at a level four or five and that he had no new symptoms.  Plaintiff reported no side effects from his previously prescribed medications but reported that Neurontin made him drowsy, which was tolerable, and that Neurontin really helped him with his sleep.  Plaintiff reported that he was participating in physical therapy through the Physical Therapy Center.  Physical examination was unchanged from the last visit.  Plaintiff was diagnosed with chronic low back pain, right sciatica, and failed back surgery syndrome.

Plaintiff's dosage of Neurontin was increased and it was recommended that plaintiff discontinue Naproxen. Plaintiff was instructed to continue with his other medications as prescribed by Dr. Nayak. Plaintiff was further instructed to return in four weeks. (Tr. 288.)

Plaintiff returned to the Neurology Clinic on October 18, 2004. Plaintiff reported that his neck pain and low back pain had worsened and that he also experiences right hand and arm pain. Plaintiff also reported that his legs occasionally give out. No weakness or numbness was noted positionally. X-rays and CT scans of the cervical spine were ordered and plaintiff was instructed to continue with his Amitriptyline and N-SAIDS. (Tr. 260.)

A CT scan of the cervical spine taken October 28, 2004, was unremarkable. (Tr. 259.) X-rays taken that same date were normal. (Tr. 258.)

Plaintiff participated in physical therapy on eight occasions between September 24 and November 11, 2004. Plaintiff tolerated the therapy well and showed increased strength and flexibility, although plaintiff continued to complain of pain. Plaintiff failed to appear for scheduled therapy sessions on November 15 and 23, 2004. (Tr. 227-32.)

Plaintiff returned to St. Louis ConnectCare on November 18, 2004, and complained of continued back pain. It was noted that plaintiff needed medication refills and a referral for Neurology. Plaintiff was instructed to return in six months. (Tr. 322.)

Plaintiff was discharged from physical therapy on

November 30, 2004. Upon discharge, it was observed that plaintiff had increased his trunk flexion and left side bending, but had decreased extension and right side bending. Trunk rotation had improved. Plaintiff's flexibility of the hamstrings and piriformis was noted to have improved; however, it was noted that intermittent numbness continued. (Tr. 226.)

On November 30, 2004, plaintiff was examined by Dr. Llewellyn Sale, Jr., for disability determinations. (Tr. 310-17.) Dr. Sale noted plaintiff's chief complaints to be pain in his back, neck, legs, and hands; and pain in his left eye and cheekbone. Dr. Sale noted plaintiff to have difficulty with language and expressed uncertainty as to whether they could communicate satisfactorily. (Tr. 310.) Plaintiff reported his medication to be partially effective with his neck pain. Plaintiff reported that he experiences back and leg pain most of the time. Plaintiff estimated that he could walk two or more blocks if he walks slowly; could stand intermittently for at least two hours during the day, and sit intermittently for three hours during the day; and could lift ten pounds. Dr. Sale noted plaintiff able to bend forward somewhat. Plaintiff reported doing only a little light housework and that he rarely goes shopping. With respect to the pain in his hands, plaintiff reported that he can write, button his shirt, hold a coffee cup, and open a jar lid most of the time. Dr. Sale noted plaintiff's medications to be Amitriptyline, Naproxen, Ultracet, and Neurontin. Physical examination showed heightened blood pressure. (Tr. 311.) Plaintiff exhibited tenderness with pressure

over the left orbit. Plaintiff had slight decrease in range of motion of the neck. (Tr. 311, 317.) Slight tenderness was noted about the cervical and lumbar areas without muscle spasm. Flexion, extension and lateral flexion were noted to be decreased. There was slight decrease in flexion and extension of the knee joints. (Tr. 311, 316-17.) Plaintiff's grip strength was noted to be slightly decreased at 4/5. (Tr. 311, 316.) Plaintiff was able to walk on his heels and toes, and could squat up to fifty percent. (Tr. 312.) Neurological examination was unable to produce ankle jerks. Straight leg raising was slightly reduced in the supine position. (Tr. 312, 317.) Dr. Sale diagnosed plaintiff with low back pain secondary to trauma and surgery; cervical spine discomfort due to being mugged; leg pain possibly secondary to lumbar spine problems; hand pain, but with use of the hands noted to be adequate; and post-traumatic condition of left orbit and cheekbone with pain present upon pressure. (Tr. 312.)

X-rays of plaintiff's lumbar spine taken November 30, 2004, showed narrowing and sclerosis of the L4/5 and L5-S1 disc spaces with spinal fusion supported by plates and screws, as well as evidence of decompression posterior elements of the lumbosacral spine. (Tr. 314.)

An eye examination performed for disability determinations on November 30, 2004, showed plaintiff's visual acuity in the right eye to be 20/30 and in the left eye to be 20/200. (Tr. 315.)

Plaintiff returned to the Pain Clinic on December 15,

2004, and reported his pain to currently be at a level four, with such pain ranging in intensity from a level three to a level seven. Dr. Maw noted plaintiff to be very compliant with his medication and Pain Clinic visits. Plaintiff reported his pain to be less than the last visit, but that he continues to experience throbbing, shooting and burning pain, as well as numbness. Plaintiff reported the pain to worsen in the afternoon and evening after standing or walking for a long time. Dr. Maw noted plaintiff to be taking Naproxen, Neurontin, Ultracet, and Amitriptyline. Physical examination was unchanged from the last visit. Plaintiff was diagnosed with chronic low back pain, right sciatica, post laminectomy syndrome, and neuropathic pain. Plaintiff's dosage of Neurontin was increased and plaintiff was instructed to continue with his other medications. Consideration was given regarding future injections if the pain worsened or was not relieved, but Dr. Maw noted plaintiff's pain to be well controlled with medical treatment and planned to continue with such treatment. (Tr. 281.)

Plaintiff returned to the Pain Clinic on January 12, 2005, and reported an increase in his pain. Plaintiff also reported that he had been unable to sleep very well and that his medication caused dizziness. Physical examination remained unchanged. Dr. Maw continued in the previous diagnoses and recommended that plaintiff participate in a home exercise program inasmuch as plaintiff could not tolerate therapy at the Physical Therapy Center. Plaintiff was instructed to decrease his dosage of Amitriptyline and to otherwise continue with his other medications.

Ambien[13] was prescribed for sleep. Plaintiff was instructed to return in four to six weeks. (Tr. 274.)

Plaintiff visited the Neurology Clinic on February 7, 2005, and reported that he experiences neck pain and hand pain and that he experiences decreased sensation in his right fingers with parasthesias at night. Pinprick sensation was noted to be decreased in the right fingers. Strength was measured to be 5/5. EMG and NCS studies were ordered to rule out right carpal tunnel syndrome. Plaintiff was instructed to continue with Amitriptyline and Neurontin. (Tr. 255.)

On February 15, 2005, plaintiff visited the Pain Clinic and reported no change in his condition. Dr. Nhat Nguyen noted that there were no other plans to be offered by the Pain Clinic and that plaintiff would be referred back to his primary care physician for further management of his treatment and medications. Plaintiff's final diagnoses were chronic low back pain, right sciatica pain, post laminectomy syndrome, neuropathic pain, and congenital four lumbar vertebrae syndrome. Dr. Nguyen recommended that plaintiff continue with his home exercise program and that plaintiff be followed by his primary care physician. (Tr. 267.)

On March 9, 2005, plaintiff underwent nerve conduction studies in response to his complaints of right hand pain and numbness. The results of all studies were normal and showed no electrodiagnostic evidence for right carpal tunnel syndrome or for

---

[13]Ambien is indicated for the short-term treatment of insomnia. Physicians' Desk Reference 2974 (55th ed. 2001).

right ulnar neuropathy.  (Tr. 252.)

On April 7, 2005, the Neurology Clinic noted that the recent studies showed plaintiff's neck to be an unlikely source of plaintiff's symptoms.  (Tr. 256.)

Plaintiff returned to St. Louis ConnectCare on May 16, 2005, and continued to complain of back pain, leg pain, neck pain, and pain in his right side.  Plaintiff needed a new referral for Neurology.  (Tr. 320.)  Physical examination was unremarkable. Neurological evaluation was not performed given plaintiff's appointment with Neurology.  Plaintiff was diagnosed with low back pain and was instructed to continue with Ultracet.  Plaintiff was referred to Neurology and was instructed to return to St. Louis ConnectCare in six months.  (Tr. 321.)

Plaintiff visited the Neurology Clinic on June 13, 2005, who noted plaintiff's chief complaint to be of right hand pain. The negative results of plaintiff's recent diagnostic tests were noted.  Plaintiff reported no change in his symptoms, but reported continued constriction of his right arm and wrist, with throbbing pain and parasthesias in his wrist and hand.  It was noted that plaintiff rarely had difficulty with his grip.  Plaintiff's gait was normal.  Decreased pinprick sensation was noted to digits on the right hand.  Strength was measured to be 5/5.  Plaintiff was instructed to continue with physical therapy and Neurontin.  (Tr. 248.)

## IV.  The ALJ's Decision

The ALJ found that plaintiff had not engaged in

substantial gainful activity since March 2003. The ALJ found
plaintiff to have residuals of an injury to his lower back, status-
post lumbar fusion surgery, and neck strain, but that such
impairments, or combination thereof, did not meet or medically
equal any impairment listed in Appendix 1, Subpart P, Regulations
No. 4. The ALJ also found plaintiff's complaints of disabling
symptoms not to be credible. The ALJ found plaintiff to have the
residual functional capacity (RFC) to perform work except for work
that involves lifting over ten pounds, or standing and walking more
than two hours in an eight hour work day. The ALJ found plaintiff
to have no other exertional or non-exertional limitations and
determined plaintiff able to perform the full range of sedentary
work.[14] The ALJ found plaintiff unable to perform his past relevant
work as an assembler. Considering plaintiff's age, education, RFC,
and vocational factors, the ALJ determined Rule 201.27, Table 1 of
Appendix 2, Subpart P, Regulations No. 4 to dictate a finding of
not disabled. As such, the ALJ concluded that plaintiff was not
under a disability. (Tr. 18-19.)

## V. Discussion

To be eligible for Supplemental Security Income under the
Social Security Act, plaintiff must prove that he is disabled.
Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker

---

[14]Sedentary work involves lifting no more than ten pounds at
a time and occasionally lifting or carrying articles like docket
files, ledgers, and small tools. Although a sedentary job is
defined as one which involves sitting, a certain amount of walking
and standing is often necessary in carrying out job duties. Jobs
are sedentary if walking and standing are required occasionally and
other sedentary criteria are met. 20 C.F.R. § 416.967(a).

v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do [her] previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. § 416.920; Bowen v. Yuckert, 482 U.S. 137, 140–42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities. If the claimant's impairment(s) is not severe, then he is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed

impairments, he is conclusively disabled.  At the fourth step, the Commissioner establishes whether the claimant can perform his past relevant work.  If so, the claimant is not disabled.  Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Estes v. Barnhart</u>, 275 F.3d 722, 724 (8th Cir. 2002).  Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion.  <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1147 (8th Cir. 2001).

To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

1.  The credibility findings made by the ALJ.

2.  The plaintiff's vocational factors.

3.  The medical evidence from treating and consulting physicians.

4.  The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.  Any corroboration by third parties of the plaintiff's impairments.

6.  The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth

the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision.  Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999).  However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence.  Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)).  A Commissioner's decision may not be reversed merely because substantial evidence also exists that would support a contrary outcome.  Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 977 (8th Cir. 2003).

Plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole and, specifically, that the ALJ erred by determining plaintiff's complaints of pain not to be credible and therefore erred in failing to consider plaintiff's pain in his RFC determination.  Plaintiff claims that the ALJ further erred in his RFC determination by also failing to consider plaintiff's work-skill limitations as found by MERS/ Goodwill; plaintiff's decreased grip strength; plaintiff's decreased eyesight; plaintiff's need to alternate between sitting and standing; and plaintiff's need to avoid bending, twisting or stooping.  Finally, plaintiff claims that the ALJ erred in failing to call and elicit testimony from a vocational expert as to what effect plaintiff's non-exertional impairments of pain, decreased

grip strength and decreased eyesight has on his ability to perform other work; 2) what effect plaintiff's limitation in squatting has on plaintiff's RFC to perform work; and 3) what affect plaintiff's need to alternate between sitting and standing has on his RFC to perform work.

A.   Credibility Determination

Before determining a claimant's RFC, the ALJ must first evaluate the claimant's credibility. Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005). In determining the credibility of a claimant's subjective complaints, the ALJ must consider all evidence relating to the complaints, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted). Although the ALJ may not discount subjective complaints on the sole basis of personal observation, he may disbelieve a claimant's complaints if there are inconsistencies in the evidence as a whole. Id.

When, on judicial review, a plaintiff contends that the ALJ failed to properly consider his subjective complaints, "the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to the plaintiff's complaints . . . under the Polaski standards and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount his

or her testimony as not credible." Masterson v. Barnhart, 363 F.3d 731, 738-39 (8th Cir. 2004). It is not enough that the record merely contain inconsistencies. Instead, the ALJ must specifically demonstrate in his decision that he considered all of the evidence. Id. at 738; see also Cline v. Sullivan, 939 F.2d 560, 565 (8th Cir. 1991). Where an ALJ explicitly considers the Polaski factors but then discredits a claimant's complaints for good reason, the decision should be upheld. Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001). The determination of a claimant's credibility is for the Commissioner, and not the Court, to make. Tellez, 403 F.3d at 957; Pearsall, 274 F.3d at 1218.

Invoking Polaski, the ALJ here identified what he determined to be inconsistencies in the record to support his conclusion that plaintiff's subjective complaints of pain were not credible. Upon review of the record as a whole, however, it cannot be said that the ALJ's adverse credibility determination is supported by substantial evidence.

With respect to plaintiff's pain medication and treatment, the ALJ first stated that plaintiff did not take strong pain relief medication, that a lack of strong pain medication is inconsistent with claims of disabling pain, and that pain which can be remedied or controlled with over the counter analgesics does not support a finding of disability. A review of the record, however, shows that plaintiff has continually been prescribed pain medications since April 2003, with repeated instructions to increase the dosages of such medications given their

ineffectiveness in relieving plaintiff's pain. Indeed, Ultracet, first prescribed for plaintiff in May 2003 and continually prescribed for and taken by plaintiff through at least May 2005, is medication used to relieve moderate to moderately severe pain. The ALJ's statement that plaintiff took no strong pain relief medication is contrary to the record and indeed reflects the ALJ's failure to consider the dosage, side effects and effectiveness of plaintiff's medications, despite ample evidence in the record relating thereto. See Beckley v. Apfel, 152 F.3d 1056, 1060 (8th Cir. 1998). Further, the record is devoid of any evidence that plaintiff's pain was remedied or controlled with over the counter analgesics, as suggested by the ALJ. In addition, the ALJ writes that "[t]he claimant told the consultative examiner that he takes nonsteroidal anti-inflammatory medication for pain relief" (Tr. 16). However, the undersigned has reviewed the reports of such consultative examinations and finds no such statement. Indeed, in November 2004, consultative examiner Dr. Sale noted plaintiff's medications to be Amitriptyline, Naproxen, Ultracet, and Neurontin, and that plaintiff reported only partial relief from such medications.[15] The ALJ's suggestion that plaintiff takes only non-steroidal anti-inflammatory agents and that his pain is otherwise controlled with over the counter pain medication is not supported by the record. Indeed, substantial evidence on the record as a whole shows the contrary to be true.

---

[15]Of these medications, Naproxyn is the only non-steroidal anti-inflammatory agent. See supra nn.8-10, 12.

In addition, the ALJ states that plaintiff complains of low back and neck problems, but that he "does not seek regular and sustained treatment for these conditions or any other condition." (Tr. 16.) A review of the record shows, however, that since April 2003 and continuing through June 2005, plaintiff visited his primary physician and the Neurology Clinic at St. Louis ConnectCare regarding his back and neck pain on no less than fourteen occasions. Upon referral by his primary physician, plaintiff began seeing physicians at the Barnes Jewish Hospital Pain Management Clinic in July 2004 and, during the following seven-month period, visited the Pain Clinic on no less than six occasions. In the meanwhile, from September through November 2004, plaintiff attended physical therapy at St. Louis University Hospital's Rehabilitation Clinic on eight occasions with respect to his back and neck pain. As such, in a twenty-seven month period, plaintiff sought and received treatment for his back and neck pain on twenty-eight separate occasions. In addition to these visits, plaintiff also underwent numerous diagnostic studies, including CT scans, MRI's, x-rays, and nerve conduction studies. Plaintiff's numerous and repeated visits to physicians, multiple prescription pain medications, and his availing himself of various treatment modalities for chronic pain cannot be characterized as a failure to seek regular and sustained treatment for such condition. See Beckley, 152 F.3d at 1060.

The ALJ also makes note that the plaintiff has had little or no recorded earnings since 1993 and that his parents meet his

financial needs, stating that such evidence suggests that plaintiff had reduced motivation to work.  (Tr. 17.)  A review of the record in its entirety shows, however, that plaintiff sustained a work injury in June 1993; had been awarded disability benefits with an onset date of December 1, 1993; had received such benefits through August 2001; and could have been led to believe by the SSA that he could not perform work.[16]  (Tr. 64-66.)

In addition, the ALJ also found that plaintiff's participation in Vocational Rehabilitation was inconsistent with his complaints of disabling pain inasmuch as Vocational Rehabilitation does not accept individuals if they are physically incapable of working.  The ALJ also notes that plaintiff successfully completed a trial work period and was offered employment but turned down such employment because of the long bus ride.  (Tr. 17.)  A review of the record shows, however, that plaintiff's employment obtained through Vocational Rehabilitation was terminated due to plaintiff's physical inability to perform the work, and that thereafter plaintiff's case was terminated from the

---

[16]Some of the disability benefits paid to plaintiff were considered to be an overpayment inasmuch as plaintiff had originally been awarded a closed period of disability.  However, on July 26, 2002, the Social Security Administration (SSA) determined to waive plaintiff's obligation to repay the overpayment inasmuch as plaintiff was without fault in the overpayment.  (Tr. 64-66.) As a factor in its determination of waiver, the SSA noted that the language used in its award of a closed period of disability was confusing in that it advised plaintiff that he could not do his past work.  As an additional factor, the SSA observed plaintiff to be "obviously learning disabled . . . [with] features of Down's Syndrome," and thus found the SSA to be at fault in the overpayment by failing to observe plaintiff's limitations in its processing of the original disability claim and in failing to assign a payee on account of such limitations.  (Tr. 66.)

program.  In addition, a review of the record shows plaintiff not to have declined an employment offer because of the *length* of related bus ride, but rather because the bus ride proved too difficult for him.  Indeed, plaintiff testified at the hearing that pain prevented him from continuing such work.

The ALJ also states that no physician imposed any significant and long-term limitations on plaintiff's functional capacity or opined that plaintiff was disabled.  Although the treatment notes of plaintiff's treating physicians show them not to have placed any functional limitations on plaintiff or to have rendered an opinion as to plaintiff's employability, the undersigned notes that at no time did they render an opinion that plaintiff was capable of performing work-related activities.  Treatment notes, in and of themselves, do not constitute opinion evidence as to a claimant's ability to engage in work-related activities.  Cf. Bowman v. Barnhart, 310 F.3d 1080, 1085 (8th Cir. 2002) (where cursory treatment notes fail to detail a claimant's functional abilities, ALJ had obligation to contact treating physician to obtain assessment of how claimant's impairments affect ability to engage in work-related activities); Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000) ("In spite of the numerous treatment notes . . . not one of [claimant's] doctors was asked to comment on his ability to function in the workplace.").  Nor did any of plaintiff's physicians advise or encourage plaintiff to engage in such activities.  While plaintiff's physicians did not go the extra step by stating that in their opinion plaintiff's

condition was so severe as to be disabling, there is nothing in their notes which is inconsistent with plaintiff's subjective assertions that the pain he has experienced has left him incapable of gainful employment. See Cline, 939 F.2d at 568. Indeed, plaintiff's continued referrals to the Pain Clinic and Neurology Clinic and the continued increases in dosage of plaintiff's pain medications would suggest that plaintiff's pain had not resolved to his treating physicians' satisfaction and that continued monitoring and management of plaintiff's pain was necessary. As such, absent medical evidence to the contrary, the lack of a physician's statement as to plaintiff's employability is an insufficient basis upon which to determine him not to be credible. Id. at 567.

Finally, the undersigned notes that the ALJ also found plaintiff's daily activities – including walking three or four blocks to the grocery store and walking home carrying up to ten pounds of groceries, mowing the lawn, cooking meals for himself and his mother, watching movies, and pet care – to be inconsistent with plaintiff's complaints of disabling pain. (Tr. 16.) Plaintiff testified, however, that whether and to what extent he engages in such activities depends upon the level of pain he is experiencing that day. A claimant's ability to perform limited activities on good days is not inconsistent with testimony that on bad days, he cannot function at all. Ross v. Apfel, 218 F.3d 844, 849 (8th Cir. 2000). Nevertheless, to the extent the ALJ considers plaintiff's daily activities to constitute inconsistencies in the record, such inconsistencies do not rise to the level of substantial evidence on

the record as a whole to support the ALJ's decision to discount plaintiff's testimony.  See Burress v. Apfel, 141 F.3d 875, 881 (8th Cir. 1998).  This is especially true here where many of the alleged inconsistencies upon which the ALJ relied to discredit plaintiff's subjective complaints are not supported by, and indeed in some instances are contrary to, the record.  Such discrepancies undermine the ALJ's ultimate conclusion that plaintiff's symptoms are less severe than he claims.  Baumgarten v. Chater, 75 F.3d 366, 368-69 (8th Cir. 1996).

In light of the above, it cannot be said that the ALJ demonstrated in his written decision that he considered all of the evidence relevant to plaintiff's complaints or that the evidence he considered so contradicted plaintiff's subjective complaints that plaintiff's testimony could be discounted as not credible. Masterson, 363 F.3d at 738-39.  As such, the ALJ's adverse credibility determination is not supported by substantial evidence on the record as a whole.  Because the ALJ's decision fails to demonstrate that the ALJ considered all of the evidence before him under the standards set out in Polaski, this cause should be remanded to the Commissioner for an appropriate analysis of plaintiff's credibility in the manner required by and for the reasons discussed in Polaski.

B.   Determination of RFC

Where an ALJ errs in his determination to discredit a claimant's subjective complaints of pain, the resulting RFC assessment is flawed and cannot be sustained.  See Ross, 218 F.3d

at 849.  In addition, as noted by the plaintiff, the ALJ here failed to address evidence in the record demonstrating other potential limitations in plaintiff's ability to perform certain work-related functions, with such evidence including the results of MERS/Goodwill's vocational testing, objective findings of plaintiff's limitations in bending and twisting, and plaintiff's need to alternate between sitting and standing.

"[I]t is incumbent upon the [Commissioner] to 'establish by medical evidence that the claimant has the requisite RFC'" to perform work.  Vaughn v. Heckler, 741 F.2d 177, 179 (8th Cir. 1984) (quoting McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)).  "'[I]f a treating physician . . . has not issued an opinion which can be adequately related to the [Social Security Act's] disability standard, the ALJ is obligated . . . to address a precise inquiry to the physician so as to clarify the record.'" Id. (quoting Lewis v. Schweiker, 720 F.2d 487, 489 (8th Cir. 1983)).  In the absence of medical evidence demonstrating the extent to which plaintiff may be limited in his ability to perform specific exertional work activities, such as standing, walking, sitting, alternating positions, bending, twisting, stooping, etc.; or for how long plaintiff had been or is expected to be restricted by such limitations, the ALJ had a duty to fully and fairly develop the record by seeking an opinion from plaintiff's treating physicians as to how plaintiff's impairments affect his ability to perform such specific functions in the workplace.  See Nevland, 204 F.3d at 858; see also Lauer v. Apfel, 245 F.3d 700, 705-06 (8th

Cir. 2001). Despite the numerous treatment notes of plaintiff's treating physicians in this cause, no inquiry was made of any of these physicians as to plaintiff's ability to function in the workplace.

Accordingly, the ALJ's determination that plaintiff retained the RFC to engage in the full range of sedentary work is not supported by substantial evidence on the record as a whole. This cause should therefore be remanded to the Commissioner for a proper assessment of plaintiff's functional limitations resulting from his impairments, including obtaining information from plaintiff's treating physicians as to what level of work, if any, plaintiff is able to perform. Dixon v. Barnhart, 324 F.3d 997, 1003 (8th Cir. 2003); Nevland, 204 F.3d at 858; Vaughn, 741 F.2d at 179.

C.   Vocational Expert Testimony

In his written decision, the ALJ determined that plaintiff could not perform his past relevant work but nevertheless retained the RFC to perform a full range of sedentary work. Considering plaintiff's age, education, work experience, and his RFC to perform sedentary work, the ALJ relied on the Medical-Vocational Guidelines and determined plaintiff not to be disabled. Plaintiff claims, however, that the ALJ should have obtained testimony of a vocational expert regarding plaintiff's non-exertional limitations and that the failure to do so resulted in the Commissioner's failure to meet his burden of demonstrating that plaintiff could perform other work in the national economy. For

the following reasons, plaintiff's argument is well taken.

Where an ALJ determines that a claimant cannot perform past relevant work, the burden shifts to the Commissioner to show that there are other jobs that the claimant is capable of performing. Reed v. Sullivan, 988 F.2d 812, 815 (8th Cir. 1993). If the claimant suffers from only exertional impairments, this burden may be met by reference to the Medical-Vocational Guidelines (Guidelines). Bolton v. Bowen, 814 F.2d 536, 537 n.3 (8th Cir. 1987). Use of the Guidelines is also permissible where a non-exertional impairment is found to exist "provided that the ALJ finds, and the record supports the finding, that the non-exertional impairment does not significantly diminish the claimant's residual functional capacity to perform the full range of activities listed in the Guidelines." Harris v. Shalala, 45 F.3d 1190, 1194 (8th Cir. 1995) (citing Thompson v. Bowen, 850 F.2d 346, 349-50 (8th Cir. 1988)). See also Bolton, 814 F.2d at 537-38. The burden is on the ALJ to demonstrate that the use of the Guidelines is proper. Lewis v. Heckler, 808 F.2d 1293, 1298 (8th Cir. 1987).

Where a non-exertional impairment significantly diminishes the claimant's RFC, the Guidelines are not controlling and the ALJ must call a vocational expert or produce other similar evidence to establish that there are jobs available in the national economy for a person with the claimant's abilities. Harris, 45 F.3d at 1194; Sanders v. Sullivan, 983 F.2d 822, 823 (8th Cir. 1992); Thompson v. Bowen, 850 F.2d 346, 350 (8th Cir. 1988). The Eighth Circuit has provided some guidance in applying this

standard:

> In this context "significant" refers to
> whether the claimant's non-exertional
> impairment or impairments preclude the
> claimant from engaging in the full range of
> activities listed in the Guidelines under the
> demands of day-to-day life.  Under this
> standard isolated occurrences will not
> preclude use of the Guidelines, however
> persistent non-exertional impairments which
> prevent the claimant from engaging in the full
> range of activities listed in the Guidelines
> will preclude the use of the Guidelines to
> direct a conclusion of disabled or not
> disabled.  For example, an isolated headache
> or temporary disability will not preclude the
> use of the Guidelines whereas persistent
> migraine headaches may be sufficient to
> require more than the Guidelines to sustain
> the [Commissioner's] burden.

Thompson, 850 F.2d at 350.

Plaintiff argues here that he suffers from non-exertional limitations both physically and cognitively and that such non-exertional limitations precluded the ALJ's exclusive use of the Guidelines in determining plaintiff not to be disabled.  Because a review of the ALJ's decision shows him to have failed to properly consider plaintiff's pain as a non-exertional impairment, the ALJ erred in his determination to rely solely on the Guidelines to determine plaintiff not to be disabled.  Thompson, 850 F.2d at 349 ("Discounting [claimant's] pain necessarily led the ALJ to erroneously use the Medical-Vocational Guidelines.").

To the extent plaintiff claims that his cognitive limitations likewise precluded use of the Guidelines, plaintiff argues only that a vocational expert should have been called to

- 45 -

testify as to the effect of plaintiff's mental ability to perform work, given the findings of MERS/Goodwill that plaintiff was cognitively limited in his ability to perform certain work functions.  Plaintiff's application for disability benefits did not allege a cognitive impairment.  Nor did the issue arise at plaintiff's hearing before the ALJ.  In addition, plaintiff's counsel did not raise the issue in his brief to the Appeals Council.  Although the undersigned is aware that an ALJ has an obligation to develop an adequate record, the ALJ cannot be faulted here for failing to pursue <u>sua</u> <u>sponte</u> an issue regarding plaintiff's intellectual functioning based only on the isolated findings of MERS/Goodwill as to plaintiff's ability to perform certain work, especially given plaintiff's many years of satisfactory work as an adult.  <u>See</u> <u>Brockman v. Sullivan</u>, 987 F.2d 1344, 1348 (8th Cir. 1993).  <u>Cf.</u> <u>Battles v. Shalala</u>, 36 F.3d 43, 45 (8th Cir. 1994) (evidence before ALJ was sufficient to raise issue as to claimant's mental and psychological capacity); <u>Highfill v. Bowen</u>, 832 F.2d 112, 115 (8th Cir. 1987) (evidence "put the ALJ on notice of the need for further inquiry").

Nevertheless, as discussed above, the record supports a finding that plaintiff suffers from pain, a non-exertional impairment, and plaintiff is entitled to have a vocational expert testify as to the effect this impairment has on his RFC.  <u>Baker v. Apfel</u>, 159 F.3d 1140, 1145 (8th Cir. 1998); <u>see also</u> <u>Beckley</u>, 152 F.3d at 1060; <u>Hunt v. Heckler</u>, 748 F.2d 478, 480-81 (8th Cir. 1984).  Accordingly, this cause should be remanded to the

Commissioner for appropriate consideration of plaintiff's pain as a non-exertional impairment and to consult and obtain testimony from a vocational expert as to whether there is work in the national economy that a person with plaintiff's exertional and non-exertional impairments can perform.  <u>Sanders</u>, 983 F.2d at 824.

## VI.  Conclusion

For all of the foregoing reasons, the Commissioner's decision that plaintiff was not under a disability is not supported by substantial evidence on the record as a whole.  Upon remand, the Commissioner should inquire of plaintiff's treating physicians as to plaintiff's residual functional capacity to engage in work-related activities, any specific limitations placed upon plaintiff as a result of his impairments and treatment therefor, and the period(s) during which plaintiff was and/or is anticipated to be so restricted by such limitations.  In addition, any credibility determination regarding plaintiff's subjective complaints should be accompanied by a specific and meaningful discussion of the factors set out in <u>Polaski</u> demonstrating that all evidence of record has been considered in such determination.  Finally, given the evidence of plaintiff's non-exertional impairment(s), the Commissioner upon remand shall consult and obtain testimony from a vocational expert as to whether and to what extent plaintiff can perform work as it exists in the national economy.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED** and the cause shall be **REMANDED** to the

Commissioner for further proceedings consistent with this Memorandum and Order.

Judgment shall be entered accordingly.


Frederick R. Buckles
UNITED STATES MAGISTRATE JUDGE



Dated this __13th__ day of August, 2007.